Cite as 2024 Ark. App. 457

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-23-723

| | |
|---|---|
| | **Opinion Delivered** September 25, 2024 |
| BRENT ANTHONY TORRES | APPEAL FROM THE CRAWFORD |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 17CR-22-597] |
| V. | |
| | HONORABLE MARC MCCUNE, |
| | JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Brent Anthony Torres was convicted by a jury of rape committed against his fourteen-year-old niece, Minor Child (MC). Torres was convicted pursuant to Ark. Code Ann. § 5-14-103(a)(4)(A)(ii) (Supp. 2023), which provides that a person commits rape if he engages in sexual intercourse or deviate sexual activity with a person who is a minor and the actor is the victim's uncle. The jury sentenced Torres to 165 months in prison for the conviction.

Torres now appeals, raising one argument for reversal. Torres argues that the trial court erred in denying his motion to suppress his custodial statement because law enforcement continued to question and entice him after he invoked his Sixth Amendment right to counsel. We affirm.

## I. *Relevant Facts*

The alleged rape occurred in MC's bedroom on the night of April 17, 2021. At that time, Torres was living in MC's home where MC lived with her mother, stepfather, and five brothers. The next morning, MC told her mother that Torres had sexually assaulted her. MC underwent a sexual-assault exam, and the sexual-assault kit and her shorts were submitted for forensic testing.

Detective Jay Baker was notified by the Arkansas State Crime Laboratory that Torre's DNA was found on an item submitted to the crime lab, and Detective Baker obtained a search warrant to collect Torres's DNA to send to the crime lab for full confirmation. Detective Baker executed the search warrant at the local detention center where Torres was being held, and the execution of the warrant was recorded by Detective Baker's body camera. During the execution of the warrant, Detective Baker read Torres his *Miranda* rights and Torres stated, "I would like an attorney," before making additional comments to the officer.

Torres filed a pretrial motion to suppress the statement he made at the detention center. In his motion, Torres argued that during the reading of his *Miranda* rights, he made a clear, unequivocal invocation of his right to counsel and that the interview nevertheless continued. Torres alleged that after he invoked his right to counsel, Detective Baker made inflammatory accusations designed to elicit responses from Torres. Torres thus claimed that his statement should be suppressed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Rule 4.5 of the Arkansas Rules of Criminal Procedure, which provides, "No law enforcement officer shall question an arrested person if the person

2

has indicated in any manner that he does not wish to be questioned, or that he wishes to consult counsel before submitting to any questioning."

The trial court conducted a suppression hearing on Torres's motion to suppress his custodial statement. At the suppression hearing, Torres asserted that after he had invoked his right to counsel, Detective Baker "continued to ask him questions, including questions about *Miranda*, and then incited statements out of him by making certain comments." The State argued that Torres's motion should be denied because Detective Baker honored Torres's right to counsel and discontinued asking questions and that Torres's statements were spontaneous and not in response to any interrogation from law enforcement.

The video/audio recording of Detective Baker's execution of the search warrant at the detention center was played to the trial court at the suppression hearing. The relevant portions of the recording are as follows:

| | |
|---|---|
| DETECTIVE BAKER: | You talked to Detective Wing[1] about a year ago about a case involving your niece that hasn't ever just gone away. But everything has come back in, and there's some stuff that we're going to give you a chance to answer - - |
| BRENT TORRES: | Okay. |
| DETECTIVE BAKER: | - - if you so choose. Because a lot of the stuff you told Detective Wing has now been scientifically proven not to be true. But before we do that, I'm going to go over your *Miranda* rights with you, and then we'll dive into that. |
| . . . . | |

---

[1]On the day after the alleged rape, Corporal Justin Wing had taken a Mirandized statement from Torres wherein Torres acknowledged watching a movie in MC's bedroom with her the night before but denied that there was any sexual contact.

3

DETECTIVE BAKER: Before we start, do you understand that you have the right to remain silent?

BRENT TORRES: Uh-huh.

DETECTIVE BAKER: You understand anything you say may be used against you in court?

BRENT TORRES: Yes, sir.

DETECTIVE BAKER: You understand that you have the right to talk to an attorney before any questioning and to have one with you during questioning?

BRENT TORRES: I would like an attorney, yes.

DETECTIVE BAKER: Okay. All right. I'll finish out these questions and then we will stop. Do you understand if you can't afford to hire an attorney, one will be appointed for you by the court prior to any questions, at little or no cost?

BRENT TORRES: Uh-huh.

DETECTIVE BAKER: And do you understand if you choose to answer questions now, you can choose to stop answering questions at any time?

BRENT TORRES: Uh-huh.

DETECTIVE BAKER: And choose to speak with an attorney at any time? And does not want to, so that's fine. Okay. So here is what we've got to do today. This is a - - these were resolved from the State Crime Lab. They were taken from semen found on your niece's clothing, which confirmed through CODIS it was your DNA in that semen.

BRENT TORRES: Found on her clothing?

DETECTIVE BAKER: Uh-huh. On the shirt.

| | |
|---|---|
| BRENT TORRES: | How does that prove anything I did? I didn't - - that doesn't prove anything. |
| DETECTIVE BAKER: | I can't really ask you any questions. You can make all the comments you want. Since you've asked for an attorney, I can't really ask you any questions. I have a copy of the search warrant right here where I have to get an oral swab of your - - |
| BRENT TORRES: | That's fine. |
| DETECTIVE BAKER: | - - of your DNA. |

. . . .

| | |
|---|---|
| BRENT TORRES: | How the f*** did she get my DNA on her clothing? |
| DETECTIVE BAKER: | Man, listen. You're going to have to talk to your attorney at this point. But you left some semen on her clothes when you ejaculated. |
| BRENT TORRES: | I never did anything. |
| DETECTIVE BAKER: | Okay, that's fine. |
| BRENT TORRES: | I never touched my niece like that. |
| DETECTIVE BAKER: | Okay. |
| BRENT TORRES: | Ever. |
| DETECTIVE BAKER: | All right. Well, you'll have your day in court to offset all this scientific evidence and her witness statement and everything that you said that lines up with what she said except for the fact that you don't think you touched her. |

Detective Baker then proceeded to take oral swabs from Torres, after which the following exchange occurred:

BRENT TORRES: So just because my niece somehow got my DNA on her clothing . . . that proves I did something?

DETECTIVE BAKER: Your semen. Not your DNA. Yeah. She - -

BRENT TORRES: My supposed semen.

DETECTIVE BAKER: She got your semen on her clothing so - -

BRENT TORRES: Well, I know I sure as hell didn't do anything so - -

DETECTIVE BAKER: Okay. Well, she pulled off the heist of all heists then to steal your semen from you and put in on her clothes so - -

BRENT TORRES: There's one way I could think of how she did it. You guys might want to check her phone records.

DETECTIVE BAKER: Okay.

BRENT TORRES: You got all the text messages and sh** she sent me?

DETECTIVE BAKER: Yeah.

BRENT TORRES: And her - - through her little boyfriend. And the little f***ing sh** they pulled on me?

DETECTIVE BAKER: I'd be glad to talk to you about it sometime, man. If you get your attorney and if you decide that you want to meet with us about it, I would be delighted.

BRENT TORRES: Well, I could tell you what happened. I'm not afraid. Look. So - -

DETECTIVE BAKER: Hold on. Before you start, okay, a while ago, you asked for an attorney.

BRENT TORRES: Yes, I did.

DETECTIVE BAKER: If you go on, just understand I'm not asking questions.

| | |
|---|---|
| BRENT TORRES: | I know you're not. |
| DETECTIVE BAKER: | If you're -- |
| BRENT TORRES: | I want to -- |
| DETECTIVE BAKER: | -- telling me you want to talk -- |
| BRENT TORRES: | I'm willing to tell you my -- |
| DETECTIVE BAKER: | -- outside of an attorney, I need you to understand -- |
| BRENT TORRES: | Yeah. |
| DETECTIVE BAKER: | -- very clearly -- |
| BRENT TORRES: | Because I got nothing to hide.  I'll tell you exactly what happened. |
| DETECTIVE BAKER: | Okay.  And you understand I'm not asking -- |
| BRENT TORRES: | Yes. |
| DETECTIVE BAKER: | -- any questions right now. |
| BRENT TORRES: | Yes. |
| DETECTIVE BAKER: | Okay?  Anything you say -- |
| BRENT TORRES: | Yes. |
| DETECTIVE BAKER: | -- you're saying voluntarily. |
| BRENT TORRES: | Yes.  Yes. |
| DETECTIVE BAKER: | Okay. |

At this point in the recording, Torres went on a lengthy narrative explaining how MC and her boyfriend had pulled a prank on him.  Torres stated that he was lonely and that MC and

7

her boyfriend set him up with what was supposed to be a text exchange between Torres and the boyfriend's mother. Torres stated that during this text exchange, with whom he thought was the boyfriend's mother, "some extreme things were being sent between us." Torres stated, "Come to find out, it was my f***ing niece with her boyfriend's phone, playing a trick on me." According to Torres, MC came to him a couple days later told him she wanted to do some sexual things. According to Torres, MC told him she was going to go to the police with the text messages he had sent if he did not "let her do something to [him]." Torres then stated, "So long story short, I masturbated into a condom and I gave it to her." Torres stated:

> I don't know what she did with it, and I probably should have never done it. But I never had sex with my niece or did anything . . . sexual with her. She kind of blackmailed me. . . . And I . . . made a very stupid f***ing choice. Absolutely. But I never, ever, touched my niece.

After listening to Torres's narrative, Detective Baker asked Torres if he wanted to "go through questions" but then stated that "you asked for an attorney ten minutes ago, and I don't want to talk you out of that." Torres stated that he had nothing to hide, and he would answer some questions. Detective Baker then stated:

> This isn't my request. If you want to request to keep speaking to us, I can ask follow-up questions. But I'm real serious about your Sixth Amendment right to counsel here. So, if you want to talk to us, you're going to need to tell me that, because I'm not real comfortable asking you.

Torres again said, "I'll talk to you," after which Detective Baker stated, "I'm almost still more comfortable waiting until you're in the presence of an attorney since you asked for one a while ago." Torres responded, "All right." Detective Baker stated:

8

I tell you what. You counsel with an attorney if you so choose. You always have the right to reach back out later. If you say, "You know what? I do want to talk to you guys," you can reach out. But since we've sat in here, you initially decided you wanted an attorney. I don't want to have any chance of it look like we tried to violate your rights, so we're going to call it today.

After listening to the recording at the suppression hearing, the trial court denied Torres's motion to suppress his statement. The trial court found from the bench:

Nothing of this appears to be solicited by Detective Baker. He states multiple times, look, if you want an attorney, I will be happy and wait to talk to your attorney. And [Torres] says, no, I want to talk and he keeps talking.

The trial court found that Torres's statement was admissible because

that is all unsolicited statements and Detective Baker warns him and tells him multiple times, hey, you want an attorney, I will gladly talk to you with your attorney present and [Torres] continue[d] on.

The case proceeded to a jury trial, and MC was the first witness to testify for the State. MC testified that in February 2021, Torres moved into the home where she was living with her mother, stepfather, and five brothers. MC described an incident that occurred in her bedroom when she was fourteen years old on the night of April 17, 2021.

MC testified that Torres came into her bedroom and that they were sitting on her bed watching a movie. MC stated that Torres "slid his hand over and at first I kind of looked at him and he stopped." Then Torres slid his hand inside MC's shorts and touched her vagina, and she told him no and moved to the foot of the bed. Torres then "slid his hand up and grabbed [her] butt." After that, Torres pulled MC's shorts aside and put his tongue "all over" and inside her vagina. MC stated that she tried to move away from Torres but that it was difficult because of their size difference. MC stated that Torres flipped her from her

side to her back, pulled her legs apart, pulled her shorts down, and put his penis inside her vagina. MC stated that Torres also put his mouth on her breast.

MC stated that as she was being sexually assaulted by Torres, her three-year-old brother began crying and was walking from his bedroom to her bedroom. At that point, Torres "popped up and walked out like nothing happened." MC brought her little brother into her room, and he fell asleep in her bed as he had done many times before. MC, however, could not sleep at all and cried all night. Early the next morning, after her stepfather had left for work, MC told her mother what had happened. MC's mother took MC to the hospital, and they were sent to another facility where MC underwent a sexual-assault exam that included the taking of swabs from her vaginal area. The sexual-assault kit and MC's shorts were sent to the Arkansas State Crime Laboratory for forensic testing.

Detective Jay Baker was also called as a witness for the State. Prior to Detective Baker's testimony, Torres renewed his motion to suppress the statement he made during Detective Baker's execution of the DNA search warrant. The trial court again denied Torres's motion, stating that after Torres told Detective Baker that he wanted an attorney, Detective Baker advised Torres that because of his request, he was not asking any questions. The trial court found that Torres subsequently made statements that were not elicited by Detective Baker and that Torres's statements were spontaneous and not prompted by questions from law enforcement. During Detective Baker's testimony, the State moved to introduce the recording that was the subject of Torres's motion to suppress, and the trial court admitted the recording over Torres's objection.

10

The last two witnesses to testify for the State were Arkansas State Crime Lab forensic serologist Emme Copeland and forensic DNA analyst Jonathan Kordsmeier. Ms. Copeland testified that she found bodily fluids on the inner lining of MC's shorts, which she confirmed was semen by the presence of a protein produced by the prostate gland. Mr. Kordsmeier compared the DNA profile from the samples on MC's shorts to the known DNA sample taken from Torres, and in his analysis, he concluded within all scientific certainty that the DNA profile taken from MC's shorts originated from Torres. Mr. Kordsmeier testified further that there was an indication of male DNA on the swabs taken from the sexual-assault kit but that it was insufficient to conduct DNA testing.

Based on the evidence presented at trial, the jury convicted Torres of rape and sentenced him to 165 months in prison. Torres now appeals from his conviction, and his sole argument on appeal is that the trial court erred in denying his motion to suppress the custodial statement he gave to Detective Baker.

## II. *Standard of Review*

In reviewing the denial of a motion to suppress a custodial statement, this court makes an independent determination based on the totality of the circumstances. *Driver v. State*, 2023 Ark. 181, 678 S.W.3d 753. We will reverse the trial court's decision only if it is clearly against the preponderance of the evidence. *Id.*

## III. *Appellant's Argument*

Torres argues that the trial court erred in denying his motion to suppress his custodial statement because Detective Baker continued to question and entice him after he invoked

11

his Sixth Amendment right to counsel. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that when the person who has been advised of his right to counsel decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point. Torres argues that while Detective Baker was informing him of his *Miranda* rights, Torres made a clear and unequivocal request for counsel when he said, "I would like an attorney, yes." Torres contends that after he invoked his right to counsel, Detective Baker nonetheless continued the interrogation by making accusations about Torres's guilt. Detective Baker informed Torres more than once that his semen had been found on MC's clothing, which Torres claims was an attempt to elicit a response from Torres. Torres asserts that any statements he made after he invoked his right to counsel were in response to Detective Baker's prodding and should have been suppressed. For the following reasons, we disagree.

If a suspect waives his right to counsel after receiving *Miranda* warnings, law enforcement officers are free to question him. *North Carolina v. Butler*, 441 U.S. 369 (1979). But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards v. Arizona*, 451 U.S. 477 (1981). When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *Id.* An accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by

12

the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id.*

*Miranda* safeguards, however, come into play only when a person in custody is subjected to either express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291 (1980). In *Innis*, the Supreme Court explained further,

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. at 301–02 (emphasis in original) (footnotes omitted).

It is also well settled that a suspect's voluntary or spontaneous statement, even though made in police custody, is admissible against him. *Miranda*, *supra*; *Arnett v. State*, 353 Ark. 165, 122 S.W.3d 484 (2003). A spontaneous statement is admissible because it is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *Arnett*, *supra*. In determining whether a statement is spontaneous, we focus on whether the statement was made in the context of a police interrogation, meaning direct

13

or indirect questioning put to the accused by the police with the purpose of eliciting a statement from him. *Id.*

Applying these principles to the totality of the circumstances, we hold that the trial court's denial of Torres's motion to suppress his custodial statement was not clearly against the preponderance of the evidence. As an initial matter, Detective Baker's purpose that day was to request and collect a DNA sample from Torres. In *Talley v. State*, 2010 Ark. 357, 377 S.W.3d 222, the supreme court held that a request for a DNA sample is not an express questioning in relation to an investigation, nor does it constitute words or actions by police that are reasonably likely to elicit an incriminating response. After Torres invoked his right to counsel, Officer Baker proceeded to collect the DNA sample but did not further question Torres about the sexual assault. Although during the course of collecting the DNA sample Detective Baker stated that Torres's semen was found on MC's clothing, Detective Baker repeatedly made it clear to Torres that because Torres had requested an attorney, Detective Baker was not asking any further questions and would not do so until an attorney was present. Thus, any further statements made by Torres would be voluntary and not in response to any interrogation. Detective Baker did not ask any question, direct or implied, that requested or suggested a response form Torres. After Detective Baker's admonishment that anything he said would be voluntarily, Torres agreed it was voluntary and proceeded to give a lengthy explanation of what had happened between him and MC. Because Torres was not subject to direct or indirect interrogation at this point and Detective Baker did not elicit

Torres's statement, we conclude that the trial court did not err in refusing to suppress the statement.

Further, even were we to conclude that Torres's statement was inadmissible, we would still not reverse because its admission was harmless. In order to be harmless, a constitutional error must be harmless beyond a reasonable doubt, and in such cases, the conviction will be affirmed despite the error. *Chapman v. California*, 386 U.S. 18 (1967).

The admission of statements obtained in violation of *Miranda* may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt. *United States v. Packer*, 730 F.2d 1151 (8th Cir. 1984). To conclude that a constitutional error is harmless and does not mandate a reversal, this court must conclude beyond a reasonable doubt that the error did not contribute to the verdict. *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). The admission of evidence may be considered harmless when there is overwhelming evidence of guilt, and the error is slight. *Johnston v. State*, 2014 Ark. 110, 431 S.W.3d 895. In determining whether the error is slight, we look at whether the defendant is prejudiced. *Id.*

Here, the evidence of Torres's guilt was strong. MC testified in detail about the sexual assault and the penetration, and her testimony was corroborated by forensic evidence within all scientific certainty that the DNA profile of semen found on MC's shorts originated from Torres. Moreover, in his custodial statement, Torres never admitted guilt but instead consistently denied that there had been any sexual contact between him and MC. Therefore, we conclude beyond a reasonable doubt that any possible error in admitting Torres's

15

statement did not contribute to the verdict and that, even had any error occurred, it was harmless.

IV.  *Conclusion*

Having reviewed the record, we hold that the trial court did not err in denying Torres's motion to suppress his custodial statement.  Accordingly, we affirm Torres's rape conviction and his resulting prison sentence.

Affirmed.

BARRETT and WOOD, JJ., agree.

*Jeremy D. Wann*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.

16